United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPECIALTYCARE, INC., et al.,<br>Plaintiffs,<br>v.<br>KAISER FOUNDATION HEALTH PLAN, INC.,<br>Defendant. | Case No. 24-cv-09342-JST<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>Re: ECF No. 32 |

Before the Court is Defendant Kaiser Foundation Health Plan, Inc.'s Motion to Dismiss. ECF No. 32. The Court will grant the motion.

## I. BACKGROUND

### A. No Surprises Act

This dispute arises out of the No Surprises Act ("NSA"), Pub. L. 116-260, 134 Stat. 2758 (2021). "On December 27, 2020, Congress enacted the No Surprises Act . . . as part of the Consolidated Appropriations Act of 2021 to address surprise medical bills." *Marcus v. Rouillard*, No. CV 19-8057-GW-AGRx, 2022 WL 22573481, at *3 (C.D. Cal. Aug. 5, 2022) (citing Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-2890 (Dec. 27, 2020)), *aff'd sub nom. Martello v. Watanabe*, No. 22-55826, 2024 WL 1042992 (9th Cir. Mar. 11, 2024).

Congress passed the NSA to protect patients from surprise medical bills in situations where they have no choice over their provider.[1] Pub. L. No. 116-260, div. BB, tit. 1, 134 Stat. 1182, 2758–2890 (2020). Prior to enactment of the NSA, when a patient sought care from an out-of-network ("OON") provider, the insurer could refuse to cover any of the services or unilaterally

[1] The relevant provisions of the No Surprises Act are mirrored across titles 26, 29 and, 42 of the U.S. Code. *See* 26 U.S.C. § 9816; 29 U.S.C. § 1185e; 42 U.S.C. § 300gg-111.

decide how much to reimburse the provider. 86 Fed. Reg. 36,872, 36,874 (July 13, 2021). The provider or facility would then "balance bill" the patient for the remaining cost of the services. *Id.* Balance billing, also referred to as "surprise billing," is of particular concern when patients have little choice over providers or facilities. *Id.* A patient does not choose the hospital to which she is brought in an emergency, or which air ambulance company transports her. *Id.* In other situations, patients might seek care at an in-network emergency room only to receive services performed by an OON provider at that facility. *Id.*

"The NSA protects patients by relieving them of liability to pay for the procedure beyond their ordinary in-network insurance payments and instead has the provider and the insurer negotiate or dispute the proper payment among themselves." *Mod. Orthopaedics of NJ v. Premera Blue Cross*, No. 2:25-cv-01087 (BRM) (JSA), 2025 WL 3063648, at *3 (D.N.J. Nov. 3, 2025) (citing 42 U.S.C.A. § 300gg-111(c)(1)(A)). "It limits the amount an insured patient will pay for emergency services provided by an out-of-network provider and for certain non-emergency services provided by an out-of-network provider at an in-network facility."[2] *Marcus*, 2022 WL 22573481 at *3 (citation omitted).

When an insurer makes an initial payment or denies payment to an OON provider, the insurer and the provider must negotiate the amount of payment for a period of thirty days. *Mod. Orthopaedics*, 2025 WL 3063648 at *3 (citation omitted). "If the parties are unable to agree on the amount due, the statute provides a four-day period for either party to submit the dispute to the Secretary of Health and Human Services ("HHS"), initiating an IDR [Independent Dispute Resolution]." *Id.* (citing 42 U.S.C. § 300gg-111(c)(1)(B)).

---

[2] These situations include: "(1) out-of-network emergency services; (2) out-of-network services provided to a consumer during an outpatient observation stay or an inpatient or outpatient stay during the visit in which a consumer receives emergency services; (3) out-of-network nonemergency, non-ancillary services provided at an in-network facility; (4) out-of-network nonemergency, ancillary services provided at an in-network facility; (5) out-of-network air ambulance services; (6) services scheduled at least three business days in advance; (7) out-of-network services from a provider that initially was in network but subsequently became out of network during the course of treatment (i.e., continuity of care); and (8) out-of-network services from a provider that the consumer assumed was in network based on incorrect information from the plan." Ryan J. Rosso, Noah D. Isserman, & Wen W. Shen, Cong. Rsch. Serv., R 46856, *Surprise Billing in Private Health Insurance: Overview of Federal Consumer Protections and Payment for Out-of-Network Services* 1 (July 26, 2021)

In an IDR process, a decisionmaker (referred to as a certified IDR entity or CIDRE) conducts a baseball-style arbitration where the parties submit proposals and the CIDRE selects one. 42 U.S.C. § 300gg-111(c); *see Kim-C1, LLC v. Valent Biosciences Corp.*, 756 F. Supp. 2d 1258, 1273 (E.D. Cal. 2010). The CIDRE's determination is "binding upon the parties involved" absent "a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim." *Id.* § 300gg-11(c)(5)(E)(i)(I). A party may seek judicial review of an IDR determination only to vacate the award for corruption, fraud, misconduct, impartiality, or when the CIDRE exceeds its power. *Id.* § 300gg-111(c)(5)(E)(i)(II); 9 U.S.C. § 10(a). Otherwise, the NSA bars judicial review. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). Following the IDR determination, payment on amounts owed "shall be made directly to the [OON] provider or facility not later than 30 days after the date on which such determination is made." 42 U.S.C. § 300gg-111(c)(6).

Congress provided for enforcement of the NSA through multiple federal agencies. Congress "empowered HHS to assess penalties against insurers for failure to comply with the NSA." *Guardian Flight, L.L.C. v. Health Care Serv. Corp.*, 140 F.4th 271, 277 (5th Cir. 2025) ("*Guardian II*") (citing 42 U.S.C. § 300gg-22(b)(2)(A); 45 C.F.R. § 150.301 *et seq.*), *cert. denied*, 223 L. Ed. 2d 509 (Jan. 12, 2026). The Department of Labor may bring civil suits for violations of ERISA. 29 U.S.C. § 1132(a)(5). And the Treasury Department has wide-ranging power to tax any group health plan for the failure "to meet the requirements of chapter 100 (relating to group health plan requirements)" including the No Suprises Act. 26 U.S.C. §§ 9834, 4980D. There is no evidence in the record that any agency has ever issued civil penalties for non-payment of an IDR award, although the Centers for Medicare & Medicaid Services, which administers the independent review process, has stated that it resolved 40 non-payment disputes by 2023, but this represents an infinitesimal fraction of the disputes submitted. U.S. Gov't Accountability Off., GAO-24-106335, Private Health Insurance: Roll Out of Independent Dispute Resolution Process for Out-of-Network Claims Has Been Challenging 35 (2023) ("GAO Report"),

(https://www.gao.gov/assets/d24106335.pdf).[3] In 30 of those payment disputes, "CMS made the issuer pay the providers." *Id.*

### B. SpecialtyCare's Claims

SpecialtyCare filed an amended complaint on June 27, 2025, seeking payment for its IDR awards. ECF No. 31 at 12–13. SpecialtyCare alleges it provided Kaiser enrollees OON care; that Kaiser's payments to SpecialtyCare were insufficient; that the parties submitted the dispute to an IDR; and that the arbitrator awarded SpecialtyCare $114,813 in respect of 39 claims. *Id.* ¶¶ 3–6; ECF 31-2. Kaiser allegedly knew it was required under the NSA to remit payment to SpecialtyCare within thirty days but did not. *Id.* ¶¶ 23–26, 31, 72–73. "SpecialtyCare diligently followed-up with Kaiser through multiple avenues" but "Kaiser . . . has frequently ignored SpecialtyCare's reminders for weeks at a time and has continued to not pay the Debt." *Id.* ¶ 27. SpecialtyCare alleges that Kaiser seeks to delay payment for its own benefit: "Kaiser knows that the longer it delays or denies payment, the more it can earn from the interest and/or investment income generated for its fully insured business. By delaying payment or not paying IDR awards, Kaiser is able to keep the health plans' claims costs arbitrarily low, thus incentivizing plans to stay with them or using the results to market their services to other health plans." *Id.* ¶ 32.

SpecialtyCare further alleges that it has been assigned the right to payment and benefits by Kaiser's members and is the real party in interest for any outstanding claims. *Id.* ¶ 50. It alleges that Kaiser's failure to pay the IDR awards within 30 days of each decision violates federal law, *id.* ¶ 51, and that "Kaiser breached its obligations to both the self-funded plans it administers and the plan beneficiaries by not paying IDR awards for services rendered to plan beneficiaries," *id.* ¶ 53.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

---

[3] The federal agencies responsible for enforcing the NSA expected to receive 22,000 disputes in 22,000, but by June 2023 they had received 490,000. The three departments identified above reported that parties submitted nearly 490,000 disputes from April 2022 through June 2023. GAO Report at 2.

United States District Court
Northern District of California

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). Factual allegations need not be detailed, but must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In determining whether a plaintiff has met the plausibility requirement, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## III. DISCUSSION

Kaiser does not contest that an NSA CIDRE issued a binding determination that Kaiser owes SpecialtyCare $114,813, which it has thus far refused to pay. Instead, it argues only that SpecialtyCare has no private means to enforce the award.

### A. Implied Cause of Action (Counts II–III)

SpecialtyCare asserts what it denominates a statutory claim for nonpayment of IDR determination, ECF No. 31 ¶¶ 39–43; and a claim under an implied right of action under the NSA. ECF No. 31 ¶¶ 44–48. Kaiser does not contest that SpecialtyCare's right to payment is express under the law. SpecialtyCare does not contend that the NSA provides an express private right of action, so the Court need only address whether these causes of action were implied by Congress.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "Congress may so empower litigants expressly or implicitly." *UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695, 699 (9th Cir. 2018). When Congress does not explicitly create a cause of action, the Court must determine whether Congress implied one by "clear and unambiguous terms." *Lil' Man in the Boat, Inc. v. City and County of San Francisco*, 5 F.4th 952, 958 (9th Cir. 2021). In doing so, a court should consider the statute's language, structure, context, and legislative history. *Id.; see also FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*, 608 U.S. ----, 146 S.Ct. 1546, 1553 (2026). In all events, "[t]he central inquiry remains whether Congress intended to create,

either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979). "[E]ven where a statute is phrased in [ ] explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private remedy.'" *Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Sandoval*, 532 U.S. at 286). The Court may consider legislative history if the statute's text is unclear or the legislative history squarely contradicts the text. *See Lil' Man in the Boat*, 5 F.4th at 960 (citing *Logan v. U.S. Bank Nat. Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013)).

Kaiser argues that "[t]he structure of the NSA . . . shows that Congress did not intend for Plaintiff to privately enforce IDR determinations in federal court." ECF No. 32 at 24. It contends that by providing for enforcement of the NSA by administrative agencies, Congress meant to preclude an implied private right of action because the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* (citing *Sandoval*, 532 U.S. at 290). SpecialtyCare responds that the federal government's ability to penalize insurers for noncompliance with the NSA does not preclude an implied right of action, as dual enforcement schemes are common and the statutes at issue "do not mandate civil monetary penalties." ECF No. 36 at 20–21. It also asserts that it is the federal government's position that providers have a private right of action. *See* ECF No. 36-1 at 22 (Brief of the United States as Amicus Curiae, *Guardian Flight, LLC v. Med-Trans Corp.*, No. 24-10561 (5th Cir. 2024)).

In *Sandoval*, the Supreme Court considered the effect of Congress's provision of enforcement authority to administrative agencies on implied right of actions. In that case, a driver's license applicant brought a class action under Title VI, challenging the Alabama Department of Public Safety's official policy of administering its driver's license examination only in the English language as violative of federal regulations forbidding funding recipients from using methods that have the effect of discriminating. *Sandoval*, 532 U.S. at 275. The Court noted that the text of Title VI "provides that "[e]ach Federal department and agency . . . is authorized and directed to effectuate the [substantive] provisions of" Title VI [§ 601]." *Id.* at 288–89 (citing 42 U.S.C. § 2000d–1). The Court found that the provision of administrative enforcement,

combined with the "elaborate restrictions on agency enforcement," implied that Congress did not intend to create a private right of action. *Id.* at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). Similarly here, Congress gave the Departments of Health and Human Services, Labor, and the Treasury enforcement authority over the NSA. 42 U.S.C. § 300gg-22(b)(2)(A); 29 U.S.C. § 1132(a)(5); 26 U.S.C. §§ 9834, 4980D. This suggests that Congress meant to preclude private enforcement.

SpecialtyCare argues that the NSA should be construed as allowing for dual enforcement because no provision of the No Suprises Act designates administrative enforcement as the exclusive means of enforcement; no provision *mandates* civil monetary penalties; no civil monetary penalties have been issued; and interpreting the NSA in this way undermines Congress's intent to ensure that the IDR awards "are actually binding upon the parties involved." ECF No. 36 at 20–21.

In the face of *Sandoval*, these arguments are not enough to carry the day. "This thorough delegation of authority . . . strongly suggests Congress intended to preclude other methods of enforcement." *Northstar Fin. Advisors v. Schwab Investments*, 615 F.3d 1106, 1116–17 (9th Cir. 2010). SpecialtyCare argues that "[i]f judicial enforcement for binding IDR awards was not available, then a party dissatisfied with an IDR award could simply ignore it and the IDR award holder would never be paid." ECF No. 36 at 20. The facts show that in a very small minority of cases, federal agencies have forced (or convinced) insurers to pay disputed awards, but SpecialtyCare's larger point stands unrebutted. *See* GAO Report at 2. Nonetheless, a decision by Congress may be "harsh and misguided," "odd," or "not wise," but that generally will not stop a court from enforcing it by its terms. *See United States v. Paulson*, 68 F.4th 528, 544–45 (9th Cir. 2023) (citation modified). Nor may a court "disregard statutory text where it conflicts with our policy preferences." *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1088 (9th Cir. 2015). To the Court's knowledge, no case decided since *Sandoval* has found an implied private right of action where Congress enacted administrative enforcement provisions like those present here outside of

this context.[4]

The Court requested additional briefing regarding an issue raised for the first time at the motion hearing. ECF No. 41. Plaintiffs raised that Congress had failed to provide any remedy when an IDR award was less than the initial payment, *i.e.*, when the insurer had paid more to the provider than was owed for its services. In that circumstance, the provider would be required to pay the insurer for the overpayment. SpecialtyCare argues that the failure to include this circumstance in the No Suprises Act implies that the administrative enforcement remedy is not so comprehensive as to preclude an implied right of action. ECF No. 44 at 5–6. Kaiser contends that SpecialtyCare's hypothetical is irrelevant to the case at hand since Congress provided a method for enforcing the substantive rule at issue and that there is no substantive rule requiring return of overpayments to insurers, so an enforcement mechanism was not required. ECF No. 45 at 4–5. The Court finds that Kaiser has the better argument.

The Court finds that the availability of enforcement of the NSA by three federal agencies precludes an implied private cause of action under the NSA. Kaiser's motion to dismiss Counts II–III is granted.

**B. Federal Arbitration Act § 9 (Count I)**

SpecialtyCare seeks to confirm its IDR award under § 9 of the Federal Arbitration Act ("FAA"). ECF No. 31 ¶¶ 34–38; 9 U.S.C. § 9. Kaiser contends that SpecialtyCare cannot bring a claim under § 9 of the FAA because Congress included references to only § 10 in the NSA and otherwise barred judicial review.

The NSA provides, in relevant part,

> A determination of a certified IDR entity under subparagraph (A)—

---

[4] In the NSA context, the Court in *Guardian Flight I* did not consider the agencies' enforcement power in denying Defendants' motion to dismiss. *See Guardian Flight LLC v. Aetna Life Ins. Co.*, 789 F.Supp.3d 214, 225–29 (D. Conn. 2025) ("*Guardian Flight I*"). *See also* Order, *Guardian Flight LLC v. Aetna Life Ins. Co.,* No. 24-cv-0680-MPS (D. Conn Sept. 30 2025) ("It is possible I would have reached a different conclusion had that issue been briefed"). The Court in *PHI Health, LLC v. Optimum Choice, Inc.*, No. 25-cv-2320-ABA, 2026 WL 850453, at *10 (D. Md. Mar. 27, 2026) found there was an implied private right of action because the provisions of the NSA do not "empower agencies to enforce individual IDR awards" and the penalties are paid to the government, not the provider. That decision appears to reflect the minority view. *See, e.g.,* ECF Nos. 40, 48, 53, 56, 75.

> (I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and
>
> (II) *shall not be subject to judicial review*, except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9.

42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) (emphasis added).

The FAA applies to written contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. A party moving to confirm an arbitration award under § 9 must file the agreement, the award, and each notice, affidavit, or other paper used upon application to confirm the award. 9 U.S.C. § 13.

Kaiser makes two arguments in support of its motion to dismiss this claim. First, Kaiser contends that SpecialtyCare's FAA claim fails because there is no written arbitration agreement between the parties. ECF No. 37 at 8. SpecialtyCare responds that the "binding" language in § 300gg-111 gives the Court authority to compel compliance with an IDR award, ECF No. 36 at 14 (citing *GPS of N.J.*, 2023 WL 5815821, at *10); and that an arbitration agreement is not a precondition to seeking confirmation of a binding IDR award. *Id*. Second, Kaiser argues that the NSA's prohibition of "judicial review," except for the purposes set forth in § 10(a) of the FAA, precludes a court from confirming or enforcing an IDR award. ECF No. 37 at 9. It notes that the FAA has a separate provision, § 9, to enforce an award in arbitration, but that provision was not incorporated into the NSA. *Id.*

"[T]he FAA requires a writing." *Deneau v. Coastal Home Care Servs., Inc.*, 744 F. Supp. 3d 950, 953 (N.D. Cal. 2024); *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1439 (9th Cir. 1994). Section 9, on which SpecialtyCare's hopes to rely, explicitly refers to such an agreement. 9 U.S.C. § 9 ("parties in their agreement have agreed. . ."). It is not disputed that the parties had no pre-existing written contract or agreement. Indeed, the IDR process was instituted precisely *because* there was no pre-existing agreement between Kaiser and SpecialtyCare. Nevertheless, SpecialtyCare argues that § 9 is still applicable, citing three cases in support: *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 n.6 (2008); *Qorvis Comms., LLC v. Wilson*, 549 F.3d 303, 308 (4th Cir. 2008); and *Booth v. Hume Publ'g*, 902 F.2d 925, 930 (11th Cir. 1990). In each of those cases, however, the parties had a written agreement to arbitrate, and the only

question was whether the parties agreed to allow judicial enforcement. These cases do not assist SpecialtyCare.

As to SpecialtyCare's second argument, Congress incorporated the FAA's standard for vacating or setting aside arbitration awards into the NSA but chose to exclude the other provisions of the FAA. 42 U.S.C. § 300gg-111(c)(5)(E)(i). A "fundamental principle of statutory interpretation [is] that absent provisions cannot be supplied by the courts." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019). Congress knows how to incorporate the entire FAA when it writes a statute that contemplates the issuance of binding awards. *See, e.g.,* 5 U.S.C. § 580(c) (Administrative Dispute Resolution Act). But it chose to exclude § 9 of the FAA when enacting the No Suprises Act. This implies that Congress made a deliberate choice. *Guardian II*, 140 F.4th at 276; *see also* ECF No. 32 at 22 (citing 5 U.S.C. § 581(a); *Hall Street Assocs.*, 552 U.S. at 578); 33 U.S.C. § 2236(b)(2) (allowing judicial review of adverse outcome regarding port and harbor dues); 42 U.S.C. § 10139 (allowing judicial review to challenge adverse agency adjudications)).

Furthermore, the No Suprises Act explicitly bars "judicial review" except to vacate the IDR award under § 10(a) of the FAA. *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). Congress has used "judicial review" to refer to private civil actions, 33 U.S.C. § 2236(b)(2), 42 U.S.C. § 10139(b), including actions to enforce arbitration awards, 5 U.S.C. § 581(a); *see also Hall St. Assocs.,* 552 U.S. 578 (observing that the FAA "provides for expedited judicial review to confirm, vacate, or modify arbitration awards.").

In short, SpecialtyCare cannot seek an order from this Court confirming their IDR award under the FAA. The Court grants Kaiser's motion to dismiss Count I.

### C. Denial of Benefits Claim under ERISA (Count IV)

In Count Four, SpecialtyCare asserts a claim for improper denial of benefits under ERISA § 502(a)(1)(B) to enforce the terms of a participant or beneficiary's plan. ECF No. 31 ¶¶ 49–57. Kaiser argues that SpecialtyCare lacks Article III standing because SpecialtyCare stands in the shoes of the enrollees—who are not required to pay anything more regardless of the outcome of an

IDR process and thus have suffered no harm.[5] ECF No. 32 at 26–27. Kaiser further argues that even if SpecialtyCare has Article III standing, it has failed to plead the elements of an ERISA claim by failing to plead both an adverse benefit determination and the exhaustion of administrative remedies. *Id.* at 27–28. SpecialtyCare responds that "[v]iolations of ERISA plan terms are concrete injuries for purposes of Article III standing" and "[a] denial of plan benefits is a 'concrete injury' even where the beneficiary was not subject to balance bills." ECF No. 36 at 22 (citing *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004); *Guardian I*, 789 F. Supp. 3d at 232). SpecialtyCare further contends that it asserts a valid ERISA claim because non-payment of an IDR award constitutes an adverse benefit determination and exhaustion of administrative remedies is not required. ECF No. 36 at 24 & n.16.

**1. Article III Standing**

To have Article III standing, a plaintiff is required to show it has a "personal stake" in the outcome of the litigation and fulfill certain requirements: that she suffered an "injury-in-fact" that is "concrete," "particularized," and "actual or imminent;" that the injury is "fairly traceable" to the conduct complained of; and that injury is likely to be redressable by a favorable decision. *Popa v. Microsoft Corp.*, 153 F.4th 784, 188 (9th Cir. 2025). The party invoking federal jurisdiction bears the burden of demonstrating she has standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021).

Kaiser argues that its plan members—and therefore SpecialtyCare as their assignee—lack standing because they suffer no injury from non-payment of an IDR award: "beneficiaries are not involved in the IDR process, they are not entitled to receive any portion of awards issued through it, and regardless of the outcome of the IDR process, out-of-network providers are prohibited from seeking any additional payments from the beneficiary for the services." ECF No. 32 at 27 (citing 42 U.S.C. § 300gg-132). SpecialtyCare concedes that the enrollees who received its services have not suffered a financial injury or risk of financial injury, but argues that Kaiser's members have suffered an injury by failing to receive the benefit of their bargain with Kaiser. ECF No. 36 at 23

[5] Kaiser does not dispute that SpecialtyCare is the assignee of its members' benefits.

United States District Court
Northern District of California

n.15 (citing *Mitchell v. Blue Cross Blue Shield of N.D.*, 953 F.3d 529, 536 (8th Cir. 2020); *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018)).

The Supreme Court in *Ramirez* addressed the question when such non-financial injuries are sufficiently concrete, requiring "a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts," but such harms need not be exact duplicates. 594 U.S. at 433.

Circuit courts across the country have held that plan participants are

> injured when a plan administrator fails to pay a healthcare provider in accordance with the terms of their benefits plan. This follows from the fact that plan participants are contractually entitled to plan benefits. The wrongful denial of plan benefits breaches the parties' contract and deprives the participant of the benefit of their bargain. This constitutes an injury to the participant—even if the benefits are assigned to a third party.

*Mitchell*, 953 F.3d at 536 (citing *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1289–91 (9th Cir. 2014)). This Court follows those courts and finds that plan participants have Article III standing when their insurer fails to pay their provider, even when there is no threat that they will have to pay the bills themselves. Therefore, SpecialtyCare may assert the denial of benefits claims on behalf of Kaiser's plan enrollees.

**2. Failure to State a Claim**

ERISA authorizes plan participants and beneficiaries to bring a civil action to recover benefits due under the terms of a plan. 29 U.S.C. § 1132(a)(1)(B). "To prevail on a claim for benefits, a plaintiff must show that (1) the [plan] is covered by ERISA, (2) the plaintiff is a participant or beneficiary of the plan, and (3) the plaintiff was wrongfully denied benefits owed under the plan." *Andrew P. v. Blue Cross of California*, No. 5:25-cv-02158-BLF, 2025 WL 3637030, at *2 (N.D. Cal. Dec. 15, 2025) (citing *Forest Ambulatory Surgical Assocs., L.P. v. United HealthCare Ins. Co.*, No. 10-cv-04911-EJD, 2011 WL 2748724, at *5 (N.D. Cal. July 13, 2011)). To satisfy the third element, the plaintiff must "identify a specific plan term that confers the benefit in question." *Keith Feder, M.D., Inc. v. Northrop Grumman Corp.*, No. 2:24-cv-2114-JLS-AJR, 2025 WL 819564, at *6 (C.D. Cal. Feb. 7, 2025).

The Supreme Court has construed § 502 to provide only "participants, beneficiaries, or

fiduciaries with an express cause of action." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 27 (1983). The Ninth Circuit, however, grants derivative standing to health care providers to whom beneficiaries have assigned their benefit claims after receiving medical care from such providers. *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1081 (9th Cir. 2000) (citing *Misic v. Building Serv. Employees Health & Welfare Trust*, 789 F.2d 1374, 1376–79 (9th Cir. 1986); *Bristol SL Holdings, Inc. v. Cigna Health and Life Ins. Co.*, 22 F.4th 1086, 1089–90 (9th Cir. 2022)).

While the briefing on this claim is not particularly robust, the Court concludes that SpecialtyCare's claim fails because it does not identify the "specific plan term that confers the benefit in question" to it or its assignor. *Keith Feder*, 2025 WL 819564, at *6. SpecialtyCare has not alleged that it was "wrongfully denied benefits owed *under the plan*," given that the IDR award was issued through a process entirely outside and independent of ERISA. *See Andrew P.*, 2025 WL 3637030, at *2.

SpecialtyCare argues that "the alleged unpaid IDR Awards meet ERISA's broad definition of adverse benefit determination which includes any denial or a failure to provide or make payment for a benefit, in whole or in part." ECF No. 36 at 24 n.16 (citing 29 C.F.R. § 2560.503(m)(4)(i)). But the NSA's enabling regulations considered and rejected this argument:

> The Departments note that there is also a significant distinction between an [adverse benefit determination ("ABD")], which may be disputed through a plan's or issuer's claims and appeals process, and a denial of payment or an initial payment that is less than the billed amount under these interim final rules, which may be disputed through the open negotiation process or through the IDR process. In general, when adjudication of a claim results in a participant, beneficiary, or enrollee being personally liable for payment to a provider or facility, this determination may be an ABD that can be disputed through a plan's or issuer's claims and appeals process. Conversely, when: (1) The adjudication of a claim results in a decision that does not affect the amount the participant, beneficiary, or enrollee owes; (2) the dispute only involves payment amounts due from the plan to the provider; and (3) the provider has no recourse against the participant, beneficiary, or enrollee, ***the decision is not an ABD and the payment dispute may be resolved through the open negotiation or the IDR process***.

86 Fed. Reg. at 36,901 (emphasis added).

For these reasons, the Court grants Kaiser's motion to dismiss Count IV, SpecialtyCare's

claim for ERISA benefits.[6]

**D. Preemption of State Law Claims (Counts V–IX)**

Kaiser moves to dismiss SpecialtyCare's state law claims as preempted. ECF No. 32 at 28. It argues that "Plaintiffs' state law claims all seek judicial review and enforcement of federal IDR determinations. But Congress declared its intent in the NSA to 'expressly *bar*[ ] judicial review of IDR awards *except* as to the specific provisions borrowed from the FAA' that are inapplicable here." *Id.* at 29 (emphasis in original) (citing *Guardian II*, 140 F.4th at 275 at *6–7; 42 U.S.C. § 111(c)(5)(E)(i)(II)). It also argues that "permitting Plaintiffs to seek judicial review and enforcement of federal IDR determinations directly conflicts with and stands as an obstacle to Congress's policy choice to enforce the statute through administrative penalties rather than private lawsuits." *Id.* (citation omitted).

"Preemption of state law, by operation of the Supremacy Clause, can occur in one of several ways: express, field, or conflict preemption." *Cohen v. Apple Inc.*, 46 F.4th 1012, 1027 (9th Cir. 2022) (quoting *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016)).

No party argues that the NSA expressly "manifests Congress's intent to displace state law," *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031–32 (9th Cir. 2024) (quoting *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1114 (9th Cir. 2022)), such that express preemption is inapplicable. "Absent express congressional preemption," field preemption occurs "'when the scope of a [federal] statute indicates that Congress intended federal law to occupy a field exclusively,'" and conflict preemption occurs where the "state law . . . 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Cohen, 46 F.4th at 1027 (alteration in original) (first quoting *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012); and then quoting *Beaver*, 816 F.3d at 1179). "[I]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,'. . . [courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal

[6] The Court need not reach Kaiser's argument that SpecialtyCare failed to exhaust administrative remedies, because there was no claim under the plan to exhaust.

Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947)). In light of this assumption, "[t]he party asserting that a claim is preempted bears the burden of establishing preemption." *Jimeno v. Mobil Oil Corp.,* 66 F.3d 1514, 1526 n.6 (9th Cir.1995).

Kaiser implies that the NSA's bar on judicial review expressly preeempts state law claims. Dkt. No. 32 at 29 (citing *Marcus*, 2022 WL 22573481, at 10). *Marcus*, however, does not stand for the proposition that the NSA expressly preempts state laws enforcing IDR determinations. "[T]he NSA . . . preempts state law that 'prevents the application' of the NSA, 42 U.S.C. § 300gg-23, and—most significantly to this case—permits states to prohibit balance billing and other insurance practices." *Marcus*, 2022 WL 22573481, at *10.

Kaiser also contends that the NSA's bar to judicial review serves to preempt SpecialtyCare's state law claims because it expressly conveys Congress's policy choice to preclude judicial review and allowing state law causes of action to proceed would create an obstacle to those purposes. SpecialtyCare responds that the structure and purpose of the NSA show Congress's intent to use both state and federal law: under the NSA, if a state does have a surprise billing law and it applies to a particular controversy, then the "recognized amount"—i.e., the benchmark for calculating a patient's cost-sharing obligation when they receive out-of-network care in a situation covered by the Act—is "determined *in accordance with such law*." ECF No. 36 at 25 (emphasis supplied by Plaintiffs) (citing 42 U.S.C. § 300gg-111(a)(3)(H)(i)).

The Court finds that SpecialtyCare's state law claims are not preempted. As stated by Congress, the purpose of the No Surprises Act was "to protect health care consumers from surprise billing practices." H.R. 3630, 116th Cong. (2019); *see also Tex. Med Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 110 F.4th 762, 767 (5th Cir. 2024) ("The No Surprises Act is intended to protect *patients* from 'surprise' medical bills by limiting the amount an insured patient will pay for emergency services furnished by an out-of-network provider." (citation modified)) .

State law claims do not stand as an obstacle to the accomplishment of that purpose. As another court has already found,

> Imposing state law penalties for Defendants' failure to timely pay

> IDR awards would not create any obstacles to the NSA's purposes and objectives, as untimely payments are already proscribed by the NSA. And state penalties could help to ensure that parties comply with the NSA's payment obligations and refrain from engaging in unfair practices to circumvent these provisions. In sum, the NSA does not preempt Plaintiffs' CUTPA claim.

*Guardian I*, 789 F. Supp. 3d at 236.

Kaiser argues that permitting state law claims to proceed would frustrate the purpose of the NSA to bar judicial review. The purpose of the NSA is not to bar judicial review. The bar is a way of ensuring that participants in the NSA's IDR process confine themselves to the remedies set forth by Congress. But it is not a broader expression of policy that judicial review as such is undesirable.

Accordingly, the Court denies Kaiser's motion to dismiss Counts V-IX.

### E. Whether State Law Claims Are Sufficiently Pleaded

Kaiser argues that all of SpecialtyCare's state law claims are insufficiently pleaded.

#### 1. Account Stated (Count V) and Open Account (Count VI)

"To establish an account stated claim, a plaintiff must show: '(1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due.'" *Tsai v. Wang*, No. 17-CV-00614-DMR, 2017 WL 2587929, at *12 (N.D. Cal. June 14, 2017) (quoting *Zinn v. Fred R. Bright Co.*, 271 Cal. App. 2d 597, 600 (1969)). The agreement necessary to establish an account stated need not be express and may be implied from the circumstances. *Martini E Ricci Iamino S.P.A.—Consortile Societa Agricola v. Trinity Fruit Sale Co., Inc.*, 30 F. Supp. 3d 954, 976 (E.D. Cal. 2014) (citations omitted).

"An open book account is defined in Cal. Code Civ. Proc. § 337a as 'a detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relation, and shows the debits and credits in connection therewith, and against whom and in favor of whom entries are made, is entered in the regular course of business as conducted by such creditor of fiduciary, and is . . . on a card or cards of a permanent character, or is kept in any other reasonably permanent form and manner.'" *In re*

United States District Court
Northern District of California

*Roberts Farms Inc.*, 980 F.2d 1248, 1252 (9th Cir. 1992). "The elements of an open book account cause of action are: 1. That plaintiff and defendant had financial transactions; 2. That plaintiff kept an account of the debits and credits involved in the transactions; 3. That defendant owes plaintiff money on that account; and 4. The amount of money that defendant owes plaintiff." *TBS Bus. Sols. USA Inc. v. Studebaker Def. Grp., LLC*, No. EDCV 22-758 JGB (KKX), 2022 WL 17363059, at *7 (C.D. Cal. Aug. 5, 2022) (citation modified). "Importantly, a book account is created by the agreement or conduct of the parties in a commercial transaction." *Malibu Behav. Health Servs. Inc. v. Magellan Healthcare, Inc.*, No. 22-cv-01731-ODW (PVCx), 2020 WL 7646974, at *8 (C.D. Cal. Dec. 23, 2020) (citation and quotation omitted). "If there is 'no evidence of an agreement' between the parties to form a book account, and if the parties' conduct does not 'show that they intended or expected such an account would be created,' then 'there is insufficient evidence to support the finding of an open book account.'" *Id.* (quoting *Maggio, Inc. v. Neal*, 196 Cal. App. 3d 745, 752 (1987)).

Kaiser argues that SpecialtyCare fails to plead the agreement that is an essential element of both these claims. ECF No. 32 at 29–31. Plaintiffs plead that "[b]efore SpecialtyCare instituted this action, the parties had business transactions between them in which they agreed on the entire amount due as the Debt." ECF No. 31 ¶ 59. Plaintiffs also plead that Kaiser "has not fully paid the Debt" but "continues to engage in a series of transaction in an open account with Kaiser." ECF No. 31 ¶¶ 28–29. Attached to the amended complaint is a list of 39 disputed transactions with an outstanding unpaid balance, on 33 of which Kaiser has already made some payment. ECF No. 31-2 at 2. Plaintiffs' complaint alleges that SpecialtyCare continues to provide services to Kaiser's insureds, meaning additional transactions are being added to the list. ECF No. 31 ¶ 30.

The complaint fails to plead the requisite agreement between SpecialtyCare and Kaiser to assert either claim. While a CIDRE issued an award for an amount owed to SpecialtyCare, the CIDRE sought to resolve an underlying *dispute* between SpecialtyCare and Kaiser regarding the amount owed. While the NSA may require Kaiser to pay SpecialtyCare within 30 days of the CIDRE's decision, it cannot be said that Kaiser "promised to pay the stated amount." *see Tsai v. Wang*, No. 17-CV-00614-DMR, 2017 WL 2587929, at *12 (N.D. Cal. June 14, 2017) (upholding

claim where "[Plaintiff] alleges that Defendant owes him $1,110,737.42 based on their prior dealings and that 'Defendant admitted that he owed Plaintiff money'" and "[h]e also alleges that Defendant, 'by words or conduct, agreed that the amount stated . . . was the correct amount owed to Plaintiff,' and that "Defendant, by words or conduct, promised to pay the stated amount.'"). There is a debt liability with an exact and definite balance, *see* ECF No. 36 at 28 (citing *Assurance Co. of Am. v. Campbell Concrete of Nev., Inc.*, 835 F. Supp. 2d 995, 999 (D. Nev. 2011)); *see also Twin Cities Cmty. Hosp., Inc. v. Ennis, Inc.*, No. 2:23-cv-10202-AB-DFM, 2024 WL 944232, at *5 (C.D. Cal. Feb. 8, 2024)), but that does not arise out of an agreement between Kaiser and SpecialtyCare. The CIDRE's determination is more akin to a judgment, and the failure to satisfy a judgment alone does not give rise to an account stated claim. The Court grants Kaiser's motion to dismiss SpecialtyCare's account stated claim.

Kaiser is also correct as to SpecialtyCare's open book account. For that claim, SpecialtyCare states only that "Kaiser owes SpecialtyCare $114,813 that is due with applicable interest, in accordance with the attached statement of Kaiser's balance owed on the Debt." ECF No. 31 ¶ 65. SpecialtyCare does not even attempt to plead an agreement between the parties to form a book account. Kaiser's motion to dismiss SpecialtyCare's open book claim is therefore granted.

**2. Bad Faith (Count VII)**

Under California law, an insured may establish a bad faith claim by showing "that (1) benefits due under the policy were withheld and (2) the reason for withholding the benefits was unreasonable or without proper cause." *Berns v. Sentry Select Ins. Co.*, 766 Fed. Appx. 515, 517 (9th Cir. 2019). Kaiser moves to dismiss SpecialtyCare's claim for bad faith because "(1) they have no contract with Kaiser that contains an implied covenant of good faith and fair dealing, (2) they are not Kaiser's insureds, and (3) IDR awards do not implicate a denial of benefits." ECF No. 32 at 31–32. As set forth above, the Court finds that failure to pay an IDR award does not constitute a denial of benefits and there is no contract creating a duty of good faith and fair dealing. Accordingly, SpecialtyCare's bad faith claim is dismissed.

**3. Unjust Enrichment (Count VIII)**

Although the phrase "unjust enrichment is not a separate cause of action in California" is strewn across the caselaw, *see, e.g., Holt v. Globalinx Pet, LLC*, No. SACV13-0041 DOC (JPRx), 2013 WL 3947169, at *13 (C.D. Cal. July 30, 2013), the Ninth Circuit "has construed the common law to allow an unjust enrichment cause of action through quasi-contract" under California law. *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) (citing *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)).

"In order to sufficiently plead a quasi-contract claim, the plaintiff must allege (1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense." *Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1253 (N.D. Cal. 2017) (citing *Peterson v. Cellco Partnership*, 164 Cal. App. 4th 1583, 1593 (2008)). "The doctrine applies where plaintiffs, while having no enforceable contract, nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value." *Hernandez v. Lopez*, 180 Cal. App. 4th 932, 938 (2009).

SpecialtyCare pleads that "Kaiser received a benefit by receiving premiums and other consideration from the members, which in turn allowed the members to receive valuable medical care from SpecialtyCare with the expectation, by both the members and SpecialtyCare, that Kaiser would pay the benefits it agreed to pay in exchange for the premiums and consideration provided" and that Kaiser unjustly retained that benefit at SpecialtyCare's expense. ECF No. 31 ¶¶ 79–82.

Kaiser moves to dismiss the unjust enrichment because it did not request medical services from SpecialtyCare, it did not receive a benefit from such request, and SpecialtyCare did not allege a direct benefit to Kaiser. ECF No. 32 at 32–33 (citing *Twin Cities Cmty. Hosp., Inc. v. Ennis, Inc.*, No. 2:23-cv-10202-AB-DFM, 2024 WL 944232, at *5–6 (C.D. Cal. Feb. 8, 2024) and *Cal. Spine & Neurosurgery Inst. v. United Healthcare Ins. Co.*, No. 19-CV-02417-LHK, 2019 WL 4450842, at *5 (N.D. Cal. Sept. 17, 2019)). SpecialtyCare counters that "by retaining the money owed under the Debt, Kaiser earns interest and/or investment income from that retained money and further permits Kaiser to promote cost-savings to other plans" which is a benefit from Kaiser's

obligation to pay. ECF No. 36 at 29–30 (citing ECF No. 31 ¶ 32). SpecialtyCare further argues that Kaiser's argument conflates a *quantum meruit* claim for a claim for restitution or unjust enrichment.

The Court agrees with SpecialtyCare regarding the applicable law. Unjust enrichment and *quantum meruit* are similar but distinct claims under California law, and Kaiser's argument conflates the two. "An individual who has been unjustly enriched at the expense of another may be required to make restitution. Where the doctrine applies, the law implies a restitutionary obligation, even if no contract between the parties itself expresses or implies such a duty. Though this restitutionary obligation is often described as quasi-contractual, a privity of relationship between the parties is not necessarily required." *Hartford Casualty Ins. Co. v. J.R. Mktg, L.L.C.*, 61 Cal.4th 988, 998 (2015) (internal citations omitted). *Quantum meruit* requires the defendant to have expressly or impliedly requested services, *see Twin Cities*, 2024 WL 944232, at *5–7 (citing *Day v. Alta Bates Med. Ctr.*, 98 Cal. App. 4th 243, 248 (2002)), but under California law, unjust enrichment does not. *See Astiana*, 783 F.3d at 762 (stating that "the theory underlying [an unjust enrichment] claim [is] that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request" (internal citation omitted)); *Hartford*, 61 Cal. 4th at 998 ("privity of relationship between the parties is not necessarily required"); *but cf. Twin Cities*, 2024 WL 944232 at *7 (justifying dismissal of unjust enrichment claim on the grounds that Defendant did not request services). Accordingly, that Kaiser did not request services from SpecialtyCare is not a bar to SpecialtyCare's unjust enrichment claim.

Kaiser next argues that SpecialtyCare's unjust enrichment claim fails because SpecialtyCare did not "directly" benefit Kaiser. ECF No. 32 at 33; ECF No. 37 at 18–19 (citing *Mountain View Surgical Ctr. v. Cigna Health Corp.*, No. CV 13–08083 DDP (AGRx), 2015 WL 519066, at *4 (C.D. Cal. Feb. 9, 2015)). SpecialtyCare responds that by retaining the money owed to SpecialtyCare, Kaiser earns interest, receives investment income, or may otherwise use those funds "to promote cost-savings to other plans." ECF No. 36 at 29–30 (citing ECF No. 31 ¶ 32). The Court agrees with Kaiser.

*California Med. Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc.* is instructive. 94

Cal. App. 4th 151 (2001).[7] In that case, the plaintiff, California Medical Association, Inc. (CMA), was the assignee of claims owned by physicians and medical groups. CMA sued two health care insurers for payments allegedly owed to physicians for services provided to enrollees in health care service plans operated by insurer defendants. The defendant insurers entered into Defendant Enrollee Agreements with their enrollees that imposed obligations upon defendants to pay for services rendered by physicians to enrollees. They also entered into Defendant–Intermediary Agreements with various contracting entities including large medical groups and independent practice associations. Under those agreements, defendants paid their agent intermediaries to perform specific tasks on behalf of defendants, including signing up panels of primary care and specialty physicians, processing claims and making payments to physicians. The intermediaries then entered into agreements with physicians to provide health services to defendants' enrollees. To participate in the managed care plans offered by the defendants, physicians were required to enter into Intermediary–Physician Agreements or otherwise be accepted into panels of providers established by the intermediaries. Once care was provided to an enrollee, the physician submitted a claim to defendants through the intermediaries.

According to the CMA, the Intermediary–Physician Agreements required the providers to look solely to intermediaries for payment for the services provided to enrollees by the physicians.

But due to insolvency, many intermediaries failed to pay physicians for these services. Defendants maintained their contractual relationship with these insolvent intermediaries, despite knowledge of their financial instability and continued to make payments to them. Defendants denied repeated demands for direct payment by the physicians, while still collecting premiums from their enrollees.

CMA brought an unjust enrichment claim, among others, against Aetna. The Court held that claim failed because "a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights," and the case "was governed

---

[7] The following summary of the *CMA* case is largely copied verbatim from *Coast Plaza Drs. Hosp. v. UHP Healthcare*, 105 Cal. App. 4th 693, 701–02 (2002), *as modified* (Jan. 22, 2003), *as modified* (Feb. 7, 2003).

by express contracts including the defendant-intermediary agreements and defendant-enrollee agreements, as well as the intermediary-physician agreements." 94 Cal. App. 4th at 173. But the claim also failed because "because . . . any benefit conferred upon defendants by Physicians was simply an incident to Physicians' performance of their own obligations to Intermediaries under the Intermediary-Physician Agreements." *Id.* at 174. So here, the benefit conferred on Kaiser by SpecialtyCare in providing medical services to Kaiser's enrollees was incidental to the benefit it provided to the enrollees. "When a person incidentally benefits another person while performing his own duty or furthering his own aims, the incidentally-conferred benefit is not unjust enrichment." *Mapsong PC v. Blue Shield of California Life & Health Insurance Company.* 780 F. Supp. 3d 939, 945–946 (C.D. Cal. 2024) (citing *CMA*, 94 Cal. App. 4th at 174). "Any benefit [Kaiser] received from [SpecialtyCare] treating its members 'was simply an incident to' [SpecialtyCare] performing its own obligations to patients seeking treatment." *Id.* at 946.

Kaiser's motion to dismiss Count VIII is granted.

**4. Unfair Competition Law (Count IX)**

The California Unfair Competition Law (UCL) prohibits "any unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200, and provides plaintiffs with a means to seek equitable relief if they can show such practice caused them an injury in fact. Kaiser contends that SpecialtyCare lacks standing under the UCL, it does not sufficiently plead its entitlement to equitable relief, and that its claims fail on the merits.

**a. Standing**

"To have standing to assert a claim under the UCL, a plaintiff must have suffered an injury." *LegalForce RAPC Worldwide P.C. v. Trademark Engine LLC*, No. 17-cv-07303-MMC (EDL), 2019 WL 13163576, at *2 (N.D. Cal. Apr. 11, 2019) (citation omitted). They must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322 (2011) (emphasis in original).

Kaiser contends that a health care provider's claim for "restitutionary relief for the value of

services they provided to [an insurer's] enrollee" does not satisfy the economic injury requirement. ECF No. 32 at 33 (citing *Aetna Life Ins. Co. v. Young*, No. 2:23-cv-9654-MCS-JPR, 2025 WL 1357427 at *9 (C.D. Cal. Apr. 15, 2025)). SpecialtyCare responds that it has suffered an economic injury through Kaiser's non-payment of binding IDR awards and that Kaiser's case authority is inapplicable. ECF No. 36 at 31–32.

Kaiser's supporting case, *Aetna v. Young*, is not persuasive here. The conduct at issue there related to defendant's process for auditing provider payment claims. *Young,* 2025 WL 1357427 at *1, 9–10. Rather than claiming injury based on non-payment for its services, the providers brought a "resource diversion" claim based on "diverted staff resources and diverted time," *see California Med. Ass'n v. Aetna Health of California*, 14 Cal.5th 1075 (2023). The court rejected this claim, finding that plaintiffs' true claim was for actually for the value of the services it had provided to patients. Thus, its argument regarding "resource diversion" provided no support for the actual claim it was making. *Young*, 2025 WL 1357427, at *9 ("In other words, Providers' argument in briefing toward resource diversion does not provide statutory standing to seek the remedy for which they pleaded, which is the value of services to patients").

The Court finds that SpecialtyCare has standing for the claims it asserts. SpecialtyCare alleges that it has a binding award against Kaiser based on the OON medical treatment it provided Kaiser's members, and that Kaiser refuses to pay. This sufficiently alleges an economic injury that is sufficiently related to Kaiser's conduct. *Cf. Bell v. Blue Cross of California*, 131 Cal. App. 4th 211, 216–17 (2005) (finding that providers have UCL standing to pursue claims against insurers although not explicitly addressing the question of injury); *Coast Plaza Doctors Hospital v. UHP Healthcare*, 105 Cal. App. 4th 693, 706–07 (2002) (same).

**b. Equitable Relief**

The UCL provides for only equitable relief. *See Mish v. TForce Freight, Inc.*, No. 21-cv-4094-EMC, 2021 WL 4592124, at *5 (N.D. Cal. Oct. 6, 2021). Under "traditional principles governing equitable remedies in federal courts," a plaintiff "must establish that she lacks an adequate remedy at law" before equitable relief under the UCL is available. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). But "*Sonner* has limited applicability to the

pleading stage." *Pitre v. KeVita, Inc.*, No. 24-cv-06309-JST, 2025 WL 2294913, at *8 (N.D. Cal. Aug. 8, 2025) (citing *Warren v. Whole Foods Mkt. Cal., Inc.*, No. 21-cv-04577-EMC, 2022 WL 2644103, at *9 (N.D. Cal. July 8, 2022)). At the pleading stage, it is sufficient for a "plaintiff to plead that her legal remedies are inadequate or plead equitable claims in the alternative." *Id.* at *8 (citing *Brown v. Van's Int'l Foods, Inc.*, No. 22-cv-00001-WHO, 2022 WL 1471454, at *13 (N.D. Cal. May 10, 2022)); *see also Junhan Jeong v. Nexo Financial LLC*, No. 21-cv-02392-BLF, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022) (holding that a plaintiff may plead equitable relief in the alternative at the pleading stage, even where legal remedies are also sought); *Freeman v. Indochino Apparel, Inc.*, 443 F. Supp. 3d 1107, 1114 (N.D. Cal. 2020) (same). Rule 8 expressly permits a demand for relief "in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3); *Sagastume v. Psychemedics Corp.*, No. CV-20-6624 DSF (GJSx), 2020 WL 8175597, at *7 (C.D. Cal. Nov. 30, 2020) ("*Sonner* does not hold that plaintiffs may not seek alternative remedies at the pleading stage").

Kaiser contends that SpecialtyCare's UCL claim must be dismissed because it fails to allege that money damages would be inadequate. ECF No. 32 at 34. SpecialtyCare responds that it "has affirmatively alleged that because Kaiser's practice violates the UCL, even if it did not violate some other law, SpecialtyCare may lack an adequate remedy at law." ECF No. 35 at 32 (citing ECF No. 31 ¶ 86). Paragraph 86 of the amended complaint in turn states only that "[a] practice may violate the UCL . . . even if not specifically proscribed by some other law."

SpecialtyCare's response is a non sequitur. Although *Sonner* has limited applicability to the pleading stage, *Pitre*, 2025 WL 2294913, at *8, a plaintiff seeking equitable relief must at least sufficiently allege that remedies at law are inadequate, *Bride v. Snap Inc.*, No. 2:21-CV-06680-FWS-MRW, 2025 WL 819567, at *9 (C.D. Cal. Feb. 21, 2025). Because SpecialtyCare has not done so, the Court grants the motion to dismiss Count IX.

**c. Merits**

Kaiser lastly argues that SpecialtyCare's UCL claim seeks to impermissibly enforce the California Unfair Insurance Practices Act ("UIPA"). ECF No. 32 at 34. SpecialtyCare responds that the UIPA is not the only legal predicate for its "unlawful" claim, arguing that both the NSA

United States District Court
Northern District of California

and ERISA support its claim. ECF No. 36 at 33. In reply, Kaiser argues that SpecialtyCare has not "plausibly alleged that the IDR determinations at issue in this case each involved 'a qualified IDR item or service,' a necessary prerequisite to payment." ECF No. 37 at 20 (citing 29 U.S.C. § 1185e(c)(6); 42 U.S.C. § 300gg-111(c)(6)).

The UCL "prohibits any unfair competition, which means 'any unlawful, unfair or fraudulent business act or practice.'" *In re Pomona Valley Med. Grp.*, 476 F.3d 665, 674 (9th Cir. 2007) (quoting Cal. Bus. & Prof. Code § 17200, *et seq*.). The UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (quoting *Cel-Tech Comms., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)).

The Court finds that SpecialtyCare has adequately alleged unlawful conduct. Although the UCL cannot be employed to enforce the UIPA, *see Moradi-Shalal v. Fireman's Fund Ins. Co.*, 46 Cal.3d 287, 304 (1988), SpecialtyCare also pleads that Kaiser violated the NSA by not timely remitting payment for services after an IDR determination. 42 U.S.C. § 300gg–111(c)(6); *see Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (stating that "[i]t does not matter whether the underlying statute also provides for a private cause of action; section 17200 can form the basis for a private cause of action even if the predicate statute does not"). That it may not have used particular words from the statute is not determinative.

## CONCLUSION

The Court grants Kaiser's motion to dismiss. Because Counts One through Eight fail as a matter of law, dismissal as those claims is without leave to amend. *Talece Inc. v. Zhang*, No. 20-cv-03579-BLF, 2021 WL 5085976, at *4 (N.D. Cal. Nov. 2, 2021). SpecialtyCare may file an amended complaint solely to cure the deficiencies in its UCL claim within 21 days of this order.

**IT IS SO ORDERED.**

Dated: July 14, 2026

JON S. TIGAR
United States District Judge